

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 2421 | **DATE** | 9/24/2001 |
| **CASE TITLE** | DANA KASKEL vs. NORTHERN TRUST COMPANY | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]     Plaintiff's motion for summary judgment [52-1] is denied. Defendant's motion for summary judgment [49-1] is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | SEP 2 4 20## | | |
| ✓ | Docketing to mail notices. | | date docketed | | 88 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| EF | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DANA KASKEL,

           Plaintiff,

           vs.

NORTHERN TRUST COMPANY,
an Illinois Chartered Bank,

           Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. 99 C 2421

HONORABLE CHARLES R. NORGLE

**DOCKETED**

SEP 2 4 2001

## OPINION AND ORDER

CHARLES R. NORGLE, SR. District Judge

Before the court are the parties' cross motions for summary judgment. For the following

reasons, Plaintiff's motion is denied, and Defendant's motion is granted.

## I.   BACKGROUND[1]

This diversity[2] case arises from Plaintiff, Dana Kaskel's, transaction with an entity knows

as "Martin, Livingston & Sterling, Ltd.," or "MLS." On June 28, 1997, Kaskel entered into the

transaction, where she wrote and delivered to MLS a check in the amount of $250,000.00. Kaskel

characterizes the transaction as an "investment," while Defendant Northern Trust Company

characterizes it as a "loan." Whatever label is attached to the transaction, MLS and Kaskel executed

---

[1]The court takes the facts from the parties' Local Rule 56.1 statements and accompanying briefs. Disputed facts are noted in the text.

[2]Before reaching the merits of the motions, the court sua sponte raised a question of Defendant's citizenship, and ordered Plaintiff to submit a brief concerning jurisdiction. Both parties submitted briefs, and the court accepts that the parties are of diverse citizenship, conferring jurisdiction.



a loan agreement and promissory note. Under the written terms of the transaction, MLS was to repay

Kaskel by August 15, 1997 $250,000.00 plus interest calculated at 8% per annum. Despite these

written terms, Kaskel believed that she would receive from MLS at least $600,000.00 within 60

days. Neither scenario came to pass.

The check that Kaskel gave to MLS was drawn on an account at Northern Trust. The account

was a "continued interest" account, established by the New York Life Insurance Company to hold

the proceeds from a life insurance policy it issued on Kaskel's late husband. New York Life

deposited the benefits from the life insurance policy into the continued interest account. Kaskel, as

the beneficiary of the policy, had access to the funds through a checkbook. Under the terms of the

agreement between New York Life and Northern Trust, Northern Trust acts as the "processing

agent" for the continued interest account. The parties dispute whether the continued interest account

renders Kaskel a customer of Northern Trust.

On June 28, 1997, Kaskel delivered the $250,000.00 check to Leslie Hocker, purportedly an

agent for MLS. Hocker, in turn, gave the check to Ronald Forrester, another purported agent for

MLS. Kaskel disputes Hocker's and Forrester's authority to act as agents for MLS in June of 1997,

because MLS' certificate of incorporation and articles of incorporation are dated October 1, 1997.

Neither MLS, nor Hocker, nor Forrester endorsed the check.

Forrester delivered the check to Stephen Shook, as part of a transaction between MLS and

Shook. The parties dispute the purpose of MLS' delivery of the check to Shook. Northern Trust

claims that MLS tendered the check to Shook as a 1% premium for Shook to obtain another loan for

$25 million, which MLS and Shook were going to invest. Kaskel asserts that Shook was to use the

check to open an account in MLS' name, and use the money to obtain insurance on a $25 million

dollar loan to MLS. Kaskel further asserts that Shook was to receive payment for his services through profits expected to be reaped from investing the $25 million. Kaskel insists that Shook was not to personally receive any portion of the $250,000.00 check.

Shook endorsed the check in his name and deposited it in his personal account at a Bank of America location in Arizona. The Bank of America presented the check for payment to Northern Trust, which honored the check. Kaskel claims that she did not learn of Shook's actions until June 1998. Northern Trust alleges that Kaskel knew of Shook's involvement in the transactions as early as February 1998.

Kaskel did not receive payments from MLS in accordance with the loan agreement and promissory note. Instead, Kaskel received several payments from various sources: (1) a $25,000.00 payment in October 1997; (2) a $5,000.00 payment in December 1997; (3) a $1,500.00 payment in September 1998; (4) a $5,040.00 payment in December 1998; and (5) a check in the amount of $3,410.00 in March 1999. Kaskel did not attempt to cash the $3,410.00 check until the spring of 2000, and it was dishonored due to its staleness.

On April 13, 1999 Kaskel filed this suit against the Northern Trust. Kaskel alleges that Northern Trust is liable to her for the amount of the check because Northern Trust honored the check without the endorsement of the named payee, MLS. Both parties now move for summary judgment. Kaskel argues that Northern Trust is liable because it honored a check that was not properly payable. Northern Trust argues that it owed no duty to Kaskel and that the check was properly payable. Alternatively, Northern Trust argues that even if the check was not properly payable, Northern Trust is not liable because it did not cause Kaskel's loss and because Kaskel ratified Northern Trust's payment of the check.

## II. DISCUSSION

As discussed in greater detail below, the court finds that Kaskel is a customer of Northern Trust, and that the check was not properly payable. Nevertheless, Northern Trust is not liable for damages to Kaskel because Northern Trust's payment was not the legal cause of Kaskel's losses and because Kaskel ratified Northern Trust's payment through her acceptance of the promissory note and partial payments thereon.

### A. Standards for summary judgment

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Cornfield v. Consolidated High School District No. 230, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Murphy v. ITT Technical Services, Inc., 176 F.3d 934, 936 (7th Cir. 1999); see also Shank v. William R. Hague, Inc., 192 F.3d 675, 682 (7th Cir. 1999) (stating that a party opposing summary judgment must present "what evidence it has that would convince a trier of fact to accept its version of events"). A defendant is entitled to put the plaintiff to his proofs and demand a showing of the evidence. See e.g. Navarro v. Fuji Heavy Industries. Ltd., 117 F.3d 1027, 1030 (7th Cir. 1997). If the plaintiff fails to come up with the required proof, the defendant is entitled to summary judgment. See id. It bears repeating that the plaintiff must present evidence, rather than speculation and conclusions without factual support. See Rand v. CF Industries, Inc., 42 F.3d 1139, 1146-47 (7th Cir. 1994).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Bombard v. Fort Wayne

Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996). The court views the record and all reasonable

inferences drawn therefrom in the light most favorable to the party opposing summary judgment.

See Fed. R. Civ. P. 56(c), see also, Perdomo v. Browner, 67 F.3d 140, 144 (7th Cir.1995). "In the

light most favorable" simply means that summary judgment is not appropriate if the court must make

"a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962), see also, First

Nat'l. Bank of Arizona v. Cities Service Co., 391 U.S. 253, 280 (1968); Wolf v. Buss (America) Inc.,

77 F.3d 914, 922 (7th Cir. 1996). The choice between reasonable inferences from facts is a jury

function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

**B.    Applicable Law:**

The court will apply Illinois law to the facts of this case. Because this is a diversity suit, the

substantive rights of the parties are governed by state law. See Erie R.R. Co. v. Tompkins, 304 U.S.

64, 78 (1938); Lexington Ins. Co. v. Rugg & Knopp, Inc., 165 F.3d 1087, 1090 (7th Cir.1999).

Neither party provides a choice of law analysis. Instead, the parties cite Illinois common law and

Illinois statutes, namely Illinois' adoption of the Uniform Commercial Code. Relying on these

submissions, the court presumes that the parties are in agreement that Illinois law controls the

analysis. See ECHO, Inc. v. Whitson Co., 52 F.3d 702, 707 (7th Cir.1995) (noting that the court

should apply the forum state's law in the absence of any argument to the contrary).

**C.    Customer Status:**

The parties dispute whether Kaskel was a customer of Northern Trust. Northern Trust argues

that it acted only as a processing agent for the continued interest account established by New York

Life. Northern Trust points to its processing agent agreement with New York Life, which states that

Northern Trust's obligations under the processing agent agreement are limited to those that are

enumerated in the contract. Northern Trust also argues that the processing agent agreement specifically states that it is not to confer rights to any other party against Northern Trust. Kaskel counters that the processing agent agreement between New York Life and Northern Trust specifies that Northern Trust is to manage a continued interest account as it would any other demand deposit account. Kaskel further maintains that she stands in a creditor-debtor relationship with Northern Trust relative to the funds in the continued interest account, which confers customer status on her as a matter of law. As discussed below, the court agrees with Kaskel.

Section 4-104 of the U.C.C. defines a customer as "a person having an account with a bank or for whom a bank has agreed to collect items, including a bank that maintains an account at another bank[.]" 810 ILCS 5/4-104(a)(5). An "item," in turn, is defined as "an instrument or a promise or order to pay money handled by a bank for collection or payment. . . ." 810 ILCS 5/4-104(a)(9). In this case, it is undisputed that Northern Trust agreed to collect items for Kaskel, making her Northern Trust's customer.

Moreover, a checking account is a contractual relationship between a debtor (bank) and a creditor (customer/account holder). See generally 1 Henry J. Bailey, Richard B. Hagedorn, Brady on Bank Checks, ¶ 11.05 (Rev. ed. 2001). The bank is indebted to the account holder for the amount of the funds on deposit in the account. See id.; see also Monticello v. Quinn, 533 N.E. 2d 846, 849 (Ill. 1989) (noting that the relationship between the drawer and drawee on a check is a contractual one that creates a creditor-debtor relationship). That the source of the funds in an account came from a source other than the account holder does not change the fact that the bank is indebted to the account holder. Cf. Reichling v. Continental Bank, 813 F. Supp. 197, 198 (E.D.N.Y. 1993) (discussing New York law, and noting that a bank's contractual relationship of debtor and creditor

confers customer status on the creditor, notwithstanding that the source of funds was not the

creditor); Securities Fund Servs. v. American Nat'l Bank, 542 F. Supp. 323, 327 (N.D. Ill. 1982)

(denying a motion to dismiss and inferring that a party was a customer under U.C.C. § 4-104). In

this case, Northern Trust was indebted to Kaskel in the amount of the funds in the continued interest

account, notwithstanding that New York Life, rather than Kaskel, deposited those funds. Thus,

Kaskel stands in a creditor-debtor relationship with Northern Trust, and is Northern Trust's

customer.

**D.    The Check Was Not Properly Payable:**

Kaskel argues that the $250,000.00 check she wrote to MLS was not properly payable by

Northern Trust because MLS did not endorse it. Northern Trust, on the other hand, argues that the

check was properly payable because Forrester transferred the check to Shook, with the intent of

giving Shook the right to enforce the check. Northern Trust's argument is not persuasive, but

deserves attention.

U.C.C. § 4-401(a) states that "[a]n item is properly payable if it is authorized by the customer

and is in accordance with any agreement between the customer and bank." 810 ILCS 5/4-401(a).

Northern Trust cites to legal commentators who assert that there are six elements to the properly

payable rule: "(1) the drawer's authorized signature must appear on the check; (2) the check must

be paid to a person entitled to enforce it; (3) the check must not have been altered; (4) an incomplete

check must not have been completed by the addition of unauthorized terms; (5) the check must be

paid on or after the date of the check; and (6) the drawer must not have issued an effective stop

payment order." Wayne K. Lewis, Steven H Resnicoff, The New Law of Negotiable Instruments,

§ 12-3, 409-10 (1996).  According to Northern Trust, the only element in dispute is whether Shook was a person entitled to enforce Kaskel's check.

Northern Trust argues that Shook is person entitled to enforce under U.C.C. §3-301.  Section 3-301 states that a "'Person entitled to enforce' an instrument means (i) the holder of the instrument, [or] (ii) a nonholder in possession of the instrument who has the rights of a holder. . . ." 810 ILCS 5/3-301.  Northern Trust argues that Shook satisfies part (ii), that is, he is a nonholder in possession of the check, who has the rights of a holder.  Reaching this conclusion requires an analysis of two other code sections.

U.C.C. § 1-201 defines a "holder" as "the person in possession [of a negotiable instrument] if the instrument is payable to bearer, or in the case of an instrument payable to an identified person, if the identified person is in possession."  810 ILCS 5/1-201.  Because the check in question is payable to MLS, an identifiable person, Shook is a nonholder.  Thus, the question becomes whether Shook has the rights of a holder.  Northern Trust asserts that Shook has those rights under § 3-203.  Section 3-203 governs transfers of negotiable instruments, and states that a transfer occurs when someone other than the issuer of the instrument delivers the instrument to another person with the intent of giving the recipient the right to enforce the instrument.  See 810 ILCS 5/3-203.  The transferee then gains the transferor's rights to enforce the instrument, absent any fraud or illegality.  See id.  Here, Northern Trust argues that Shook has the rights of a holder because MLS, through Forrester, delivered the check to Shook with the intent of giving him the right to enforce.  Thus, Northern Trust concludes that Shook is entitled to enforce the check.

There are two flaws with Northern Trust's argument.  First, the parties dispute the factual circumstances of the transfer between Forrester and Shook, including issues of agency, fraud and

8

intent. In analyzing Northern Trust's motion for summary judgment, the court must construe factual disputes in favor of Kaskel. Therefore, for the purpose of this motion, the court assumes that Forrester and/or MLS did not intend to transfer to Shook the right to enforce the check.

Second, Illinois courts have not adopted the position that paying an order instrument to a person entitled to enforce vitiates the need for the named payee's endorsement. Under Illinois law, "A checking account creates a contractual debtor-creditor relationship between a bank (the drawee or payor bank) and its customer (the drawer); under this contract, a bank has an absolute duty to pay only the payee(s) named on a check." Sanwa Bus. Credit. Corp. v. Continental Illinois Nat'l Bank, 617 N.E.2d 253, 257 (Ill. App. Ct. 1993) (citing cases). Further, "when a check is made payable to order. . . , the drawer has the right to expect that the named payee has endorsed the check and thereby directs further negotiation, or in the alternative, that the funds have been deposited only in the account of the named payee." Id. (quoting National Bank of Monticello, 533 N.E.2d at 851). Thus, under Illinois law, a negotiable instrument payable to order is not properly payable without the named payee's endorsement. Sanwa Bus. Credit Corp., 617 N.E.2d at 257. In this case, it is undisputed that the named payee, MLS, did not endorse the check. Thus, the check was not properly payable.

### E.    Northern Trust Did Not Cause Kaskel's Loss:

Nevertheless, Northern Trust is not liable to Kaskel for damages because Northern Trust did not cause her loss. Illinois law treats Northern Trust's payment without MLS' endorsement as a failure to exercise reasonable care. See Sanwa Bus. Credit Corp., 617 N.E.2d at 258. This interpretation is consistent with the intent of the U.C.C.'s general damages provision, which is to place an aggrieved party in the same position as if the other party had fully performed. See id. It is

9

also consistent with the general rule of contract law that a breaching party is only liable for damages caused by the breach. See id. (citing cases). Thus, to recover from Northern Trust, Kaskel must demonstrate that Northern Trust's conduct was the legal cause of her loss. See id.; see also Movitz v. First Nat. Bank of Chicago, 148 F.3d 760, 762-64 (7th Cir. 1998) (discussing the difference between but for causation and legal causation).

A bank's payment of an unendorsed order instrument is prima facie evidence of loss causation. Sanwa Bus. Credit Corp., 617 N.E.2d at 259. The burden then shifts to the bank to demonstrate that the improper payment did not cause the drawer's loss. Id. If the bank presents such evidence, it is entitled to summary judgment unless the drawer presents evidence raising a question of fact on the causation issue. Id. To rebut the bank's showing, the drawer must present more than her prima facie evidence of improper payment; the drawer must present additional evidence from which a jury could infer that the bank's improper payment caused the drawer's loss. Id. at 259-60.

In this case, Kaskel has prima facie evidence that Northern Trust caused her loss because Northern Trust paid the check without MLS' endorsement. To rebut this evidence, Northern Trust points to the loan agreement and promissory note between MLS and Kaskel, and argues that MLS' breach of its obligations under those agreements is the cause of Kaskel's loss, rather than any improper payment on the check. The court agrees. It is undisputed that Kaskel and MLS executed the loan agreement and promissory note, and that Kaskel expected to receive a return from MLS of her $250,000.00 plus interest calculated at least at a rate of 8% per annum. Because that did not occur, Kaskel is seeking damages from Northern Trust. Northern Trust, however, is not responsible for MLS' failure to honor its obligations under the loan agreement and promissory note. The court

10

finds that the existence of loan agreement and promissory note, and MLS' failure to fulfill its duties thereunder is sufficient evidence to rebut Kaskel's prima facie evidence of causation.

Thus, the burden shifts to Kaskel to present additional evidence sufficient to create a genuine issue of material fact as to whether Northern Trust caused her loss. See Sanwa Bus. Credit Corp., 617 N.E.2d at 259-60. Kaskel fails to do so, indeed, Kaskel presents no evidence beyond her prima facie evidence that Northern Trust caused her loss. Instead, she argues that Northern Trust's payment enabled Shook to abscond with her money, and thereby causing her loss. This argument relies exclusively on the fact that Northern Trust paid the check without MLS' endorsement. Kaskel's argument does nothing to rebut the existence of loan agreement and promissory note, and their effect on Northern Trust's liability.

Northern Trust's payment might have been a cause in fact of Kaskel's loss, because Kaskel may not have had any loss if Northern Trust dishonored the check, but Northern Trust's breach of duty was not the legal cause of Kaskel's loss. See Movitz, 148 F.3d at 763 (discussing the "bad policy [of] encourag[ing] people harmed in some natural or financial disaster to cast about for someone on whom to lay off the consequences who had, however, committed only a technical breach of duty."); see also Jutzi-Johnson v. United States, – F.3d –, No. 00-2411, 2001 WL 1002736, *2 (7th Cir. Sept. 4, 2001) (discussing supervening cause and its effect on behavior that gives rise to liability). In other words, the law does not make Northern Trust the insurer of Kaskel's transactions, particularly a transaction as risky as the unsecured one that Kaskel entered into with MLS. See Movitz, 148 F.3d at 763 (noting that "[t]he legal system is busy enough without shouldering the burden of providing insurance against business risks."); Jutzi-Johnson, 2001 WL 1002736 at *2

(noting that "[n]othing would be gained by imposing liability in [a supervening cause] case but compensation, and compensation can be obtained more cheaply by insurance.").

Other persons, including MLS and maybe others, have obligations to repay Kaskel the money she invested in, or loaned to, MLS. Kaskel has indeed suffered a loss, but whatever recourse she may have does not lie against Northern Trust. See Movitz, 148 F.3d at 763; see also Sanwa Bus. Credit Corp., 617 N.E.2d at 259 -60 (rejecting an argument that payment on a check missing a required endorsement cause the plaintiff's loss).

F.    The Intended Payee Defense Does Not Apply:

The parties also dispute the applicability of the "intended payee" defense, which is closely related to the causation issue discussed above. A careful reading of Sanwa Bus. Credit Corp. reveals the distinction between an intended payee defense and a causation defense:

> . . . [A] bank may avoid liability for the face value of unendorsed checks if it demonstrates that the proceeds of a check reached the intended payee for the intended purpose. In doing so, the drawee shows that the drawer suffered no loss. . . . [T]hat is only one way to defend an action such as this one. A drawer must also show that the bank's conduct was a cause of its loss, so even if a drawer has suffered a loss, he cannot recover the face value of the checks if the drawee can establish that the cause of that loss was something other than the drawer's improper payment. . . . In either event, the drawer is in the same position he would have been in had the drawee fully performed, as mandated by the U.C.C.

Sanwa Bus. Credit Corp., 617 N.E.2d at 258 (citations omitted). Here, the parties present a factual dispute as to whether the intended payee, MLS, received the proceeds of the check for the intended purpose, rendering the intended payee defense inappropriate for summary judgment. This, however, does not affect the causation defense, which the court has found dispositive.

12

## G.  Kaskel Ratified Northern Trust's Payment of the Check:

Another dispositive defense to Kaskel's suit is that of ratification.  Ratification is similar to authorization, but occurs after the fact, when a person gains knowledge of an unauthorized transaction and retains the benefits of the transaction, or otherwise acts in a manner consistent with affirming the transaction.  See In re Ostrom-Martin, Inc., 202 B.R. 267, 274 (Bankr. C.D. Ill. 1996) (citing Progress Printing v. Jane Byrne Pol. Comm., 601 N.E.2d 1055 (Ill. App. Ct. 1992)); see also Stathis v. Geldermann, Inc., 630 N.E.2d 926, 932 (Ill. App. Ct. 1994) (noting that "[r]atification takes place when the principal with knowledge of the material facts regarding an unauthorized transaction takes a position inconsistent with non-affirmation of the transaction; another means of ratification occurs where the principal retains the benefit of the transaction.").

On the issue of a drawer ratifying a bank's improper payment of a negotiable instrument, Illinois law is that the drawer ratifies the bank's payment if the drawer engages in activity demonstrating that the drawer is not looking to the bank for satisfaction.  See Spec-Cast, Inc. v. First Nat'l Bank & Trust, 538 N.E.2d 543, 547 (Ill. 1989).  Thus, if a payee is indebted to a drawer, and the drawer accepts partial payment from the payee after learning of an improper endorsement, the drawer has ratified the bank's payment of the instrument, even if the decision ultimately proves to be unprofitable.  Id.

A short discussion of Spec-Cast illustrates the point.  In that case, the plaintiff/drawer wrote, but did not sign, a check payable to a named payee as a loan to the payee.  Id. at 543-44.  The payee gave the drawer a promissory note, endorsed the check, and deposited it into its account.  Id. Eventually, the check was presented to the drawee bank, which honored the check despite the absence of the drawer's signature.  Id.  The drawer objected to the bank's payment, but also accepted

13

one interest payment on the promissory note from the payee. When the payee went bankrupt, the drawer sued the bank, claiming that the check was not properly payable. The Illinois Supreme Court discussed the general rule that a drawer is not liable on a negotiable instrument absent his or her signature. Id. at 545. But the Court also noted that common law defenses, including ratification, are available to a bank that honors an instrument missing a required signature. Id. at 546-47. The Court went on to hold that the drawer's acceptance of the single interest payment on the promissory note, after learning that the bank had honored the check, constituted a ratification of the bank's payment, notwithstanding that the drawer's bargain with the payee was unprofitable. Id. at 547.

The ratification analysis of Spec-Cast applies to the case at bar. Kaskel admits that she learned in June 1998 that MLS did not endorse the check. Subsequent to learning of the improper endorsement, Kaskel accepted several payments on the promissory note and loan agreement. Kaskel's acceptance of these payments constitutes a ratification of Northern Trust's payment of the check. That her decision ultimately proved unprofitable does not change the analysis. Kaskel's acceptance of partial payment on the promissory note and loan agreement evidences her intent to seek payment from MLS rather than Northern Trust. See Spec-Cast, Inc., 538 N.E.2d at 547.

Kaskel submits three points in opposition: (1) ratification should not apply because ratification requires full knowledge of all material facts, and Shook's purportedly fraudulent acts deprived her that knowledge; (2) her acceptance of partial payments was a means of mitigating her losses, and should not be construed as ratification; and (3) she did not receive the benefit of her bargain because her investment with MLS was not carried out as planned. The court is not persuaded.

The material facts that Kaskel knew of in June 1998 were that Shook, and not MLS, had endorsed the check. Kaskel received consideration for her check, in the form of the loan agreement and promissory note from MLS. That the transaction was unprofitable does not mean that she did not accept the bargain. The undisputed facts are that Kaskel knew of the improper endorsement in June 1998, and thereafter accepted payments on her original bargain. Under the rule of Spec-Cast, Kaskel ratified Northern Trust's payment on the check, and has foregone any recovery from Northern Trust.

### III. CONCLUSION

For the foregoing reasons, judgment is entered in favor of Defendant.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, SR. Judge
United States District Court

DATED: 9/24/01